# SCANLAN *v.* SNOW.

CORPORATIONS; STOCKS AND STOCKHOLDERS; CONSTITUTION
AND BY-LAWS; CORPORATE DEEDS.

1. In a suit by the members of a corporation to invalidate a deed of the
corporation for fraud and irregularity, a petition to intervene
and be made a party complainant is properly dismissed where
the proof shows that the petitioner, although one of the original
incorporators of the company, was not a stockholder in fact
when the suit was brought.
2. While for some purposes the transfer of the stock of an incorpo-
rated company is not complete without the surrender of the cer-
tificate and the entry of the transfer on the books of the com-
pany, and the vendor is still for such purposes to be regarded
as the holder and owner of the stock, yet he is only the legal
and not the equitable owner, and not being the equitable owner,
he can have no standing in a court of equity to enforce equitable
rights appurtenant only to the beneficial ownership of the stock.
3. The administratrix of a stockholder in a corporation may maintain
a bill in equity to set aside a deed of the corporation, made
during the life-time of her decedent, for irregularity and fraud,
if such stockholder was not consulted with reference to the
making of the deed, and had no notice of the meeting at which
it was authorized.
4. One dealing with a corporation who finds its affairs in the hands of
a *de facto* board of directors, with a *de facto* president and a *de
facto* secretary, is not bound to inquire into the legality of the
election of such officers, when there are no others claiming to
have a different or a better right; and one is entitled to deal
with them, when there are no others, even though one should
know that there were grave irregularities attending their elec-
tion.
5. In general, voting by proxy at a corporate meeting cannot be
allowed, unless authorized by the charter or by-laws of the cor-
poration. But a well recognized exception to this rule prevails
in the case of stock held jointly by executors, administrators,
trustees, or other persons acting in a fiduciary capacity, who
have the right to designate one of their number to represent the
interest held by them at corporate meetings, inasmuch as the
corporation is entitled to refuse recognition of more than one
person to represent any one interest. In fact, the only way in
which stock held jointly can be voted, is by authority from all
to one of the joint holders.
6. The fact that an annual meeting, required by the by-laws of a cor-
poration to be held in a certain month, was omitted to be
then held through neglect, forgetfulness or otherwise, does not
preclude the holding of such meeting at a later time, or invali-
date a corporate act authorized at such meeting.

7. It is usual in the by-laws of a corporation to provide that the by-laws shall not be altered or amended except at some specified time, after special notice, and by a vote of two-thirds or three-fourths concurring in the change.    But in the absence of any such provision, a majority can make the change at any corporate meeting.

8. A court of equity can interpret the meaning of the by-laws of a corporation, but it cannot make by-laws.    Therefore, when the by-laws of a corporation, incorporated under general incorporation laws, provided that " The *constitution* of this association may be altered or amended by a two-thirds vote of the association at any annual meeting," and the provision was meaningless, inasmuch as the statute law and the certificate of incorporation constituted the constitution of the association, and the expression *by-laws*, and not *constitution* was probably intended to be used, nevertheless a court of equity is not justified in inserting it.

9. When the deed of a corporation which is sought by certain stockholders of the corporation to be invalidated for fraud and irregularity, is by the evidence shown to have been duly and properly executed, and the evidence, also, shows that it was authorized by the unanimous action of the board of directors ; that it was sanctioned, approved and ratified by the holders of nineteen of the twenty shares into which the capital stock of the corporation was divided, and the act itself was one competent to be performed by the company in the ordinary way, by the vote of a majority of the members, or a majority of the board of directors, it will not be disturbed.

No. 151.    Submitted November 25, 1893.—Decided January 2, 1894.

Hearing on an appeal by the complainants from a decree of the Supreme Court of the District of Columbia, holding an equity term, dismissing a bill to set aside certain conveyances of real estate. *Affirmed.*

The Court in its opinion stated the  case as follows:

This is a suit in equity to invalidate certain deeds of conveyance of real estate, or to have the grantees decreed to hold such real estate or the proceeds thereof in trust, and for the administration of such proceeds as a trust fund.

It appears from the record that prior to the year 1886, there was a corporation in the District of Columbia, known as the National Base Ball Club, organized for the purpose indicated by its name.  For some reason not quite apparent from the record, this organization was disbanded or permitted to lapse into desuetude, and a new company was incorporated on February 2, 1886, under the name of the

Washington National Base Ball Club, with a capital stock of $20,000, divided into 40 shares of the par value of $500 each, of which 20 shares were taken, and the residue were never issued or subscribed for by any one. What the precise relations were of the old company to the new organization, does not distinctly appear; but it does appear that some of the members were the same in both, and that upon compliance with certain conditions, which, however, do not seem to have been generally complied with, the members of the old organization should be entitled to stock in the new company.

The incorporation of the new company was under Sections 545 to 552, both inclusive, of the Revised Statutes of the United States for the District of Columbia, which sections constitute part of the general incorporation act in force in this District. The incorporators, who executed the certificate, were Robert C. Hewett, Charles E. White, Henry B. Bennett, Michael B. Scanlan, Robert Drinkard, and A. T. Britton; the term for which the organization was to continue was specified to be five years; and the management of the club was to be by a board of directors, five in number, for the first year, including the president and treasurer of the club. And it was also provided in the certificate of incorporation that there should be an annual election of directors, and that their duties, term and manner of election should be regulated by the by-laws of the club.

By-laws were adopted, but at what time we are not advised by the record before us; presumably it was soon after the filing of the certificate of incorporation. One of these by-laws provided for a board of seven directors, including the president and treasurer, who should be elected at the first meeting of the corporation, and should hold office for one year. Another of the by-laws provided for alteration or amendment of the by-laws by a two-thirds vote at any annual meeting. These details of the organization seem to be important in view of some of the questions raised in the development of this case.

On the 6th of February, 1886, which was four days after the filing of the certificate of incorporation, the club received a lease of the real estate involved in this suit, comprising original lots numbered three (3), four (4), five (5), six (6), seven (7), and eight (8), in square six hundred and seventy-eight (678), in the city of Washington, from William M. Galt and Thomas W. Smith, then the owners of the property, for the term of five years, upon a rent of $500 for the first year, $1,000 for the second year, and $1,250 for each of the three remaining years, with the right to the club, at any time during the term of the tenancy, or at its expiration, to purchase the property at the rate of fifty cents per square foot, the purchase money to be paid one-fourth in cash, and the residue in three equal annual payments, with interest, to be evidenced by promissory notes and secured by deed of trust in the usual form. But there was a further proviso in the contract, that, if the owners of the property should receive a *bona fide* offer therefor of more than fifty cents a square foot, they should be at liberty to sell, and the agreement with the club should be void, unless, after notice to it of ninety days, the club should determine to purchase the property forthwith at the advanced price. The lots comprised the west half of the square, and contained 170,648 square feet, which, at the rate of fifty cents a square foot, would be worth the sum of $85,324.

The affairs of the club seem to have prospered for a time, probably until the death of its first president and principal stockholder, Robert C. Hewett, who died in or about September, 1888, although it is said that for some time there was considerable friction between the stockholders of the old organization and those of the new, and there was even a suit in equity instituted by some of the members of the old club, including Charles E. White, one of the petitioners in this cause, seeking to enforce their right to membership in the new organization. In this suit there was a decree dismissing the bill of complaint.

Some time in the fall of 1888, the club had become finan-

cially embarrassed to a considerable extent, and it was pro-
posed to sell it out to Walter F. Hewett, one of the defend-
ants in this cause, who had succeeded his father, Robert C.
Hewett, in the presidency of the organization.  In October,
1888, the indebtedness amounted to $24,273, and the club
was without means to pay it.  In order to meet some of the
more pressing claims, the defendant Hewett advanced to it
$4,500 out of his own means.  The management of the club
had by this time fallen almost exclusively into the hands of
Hewett, who, either in his individual right or as administra-
tor of his father's estate, owned or controlled a majority of
the stock.

Things went from bad to worse; and in the spring of 1889
it was resolved to dispose of the rights of the club in the
property then occupied by it, and to remove to some other
location.  Thereupon Hewett undertook to negotiate a sale
of the rights of the club in the half square of ground, as well
as of the franchises of the club.  These last he succeeded, it
would seem, without great difficulty, in selling for $7,000;
but for the leasehold interest in the property and the option
to purchase it was not so easy to find a purchaser.  Hewett
seems to have consulted several real estate agents about it
during the spring and summer of 1889—among them one
James H. Marr, who undertook to negotiate a sale of the
leasehold interest and of the option to purchase.  Marr, it
seems, had already been employed by the defendant Thomas
W. Smith, who had then become the sole fee simple owner
of the property by purchase of the interest of his co-tenant
Galt, to procure a sale of the property at a higher rate than
fifty cents a square foot, so as to defeat the option held by
the club; and he had made himself quite familiar with the
condition of the title and the condition of the affairs of the
club.  Whether Marr was employed by Hewett, or whether
he approached Hewett in his own interest, seems to be some-
what controverted; but it is not a matter of any great im-
portance.  The result of Marr's intervention was that he
induced the defendant, Chester A. Snow, a patent attorney

of this city, and who seems to have been a man of some means, to make an offer to purchase for $12,200 the club's leasehold interest in the baseball ground and the option to buy the property which was contained in the lease from Galt and Smith.   The offer was accepted by Hewett, and on June 29, 1889, an agreement was made between Hewett and Snow, in which it was recited that Hewett was the owner of all the stock of the Washington National Base Ball Company, except three shares; that Snow desired to purchase the leasehold interest in the property in question, and Hewett was willing to indemnify him against any claims or demands of the holders of the three outstanding shares, or to purchase the same, and to deliver possession of the property to Snow before the ensuing first day of November; and it was provided that Hewett should thereupon assign and transfer to Snow all the interest of the Base Ball Company in the property; that Snow should pay for it $12,200 in certain specified sums, namely, $1,000 immediately in cash, $11,000 upon the determination of the title to be good, and $200 upon the delivery of possession on or before the first of November.

Mr. Irving Williamson, the attorney employed by the defendant Snow to examine the title for him, prepared a resolution to be adopted by the board of directors of the Base Ball Company authorizing the sale and conveyance to Snow; and this resolution was accordingly adopted on July 17, 1889.   On the next day, July 18, 1889, in pursuance of this resolution and in consummation of the previous agreement, a deed of assignment of the lease from Galt and Smith to the Base Ball Company was executed on behalf of the company by Walter F. Hewett as president, Luther E. Burket as secretary, and James Coleman as attorney; and this deed was recorded on September 6, 1889.   The amount of the purchase money ($12,200) was paid by Snow to Hewett.

Soon after the execution and delivery of the deed of assignment to him, Snow caused communication to be made to Smith of his desire to avail himself of the option contained in the lease to the Base Ball Company, and notified

him that he (Snow) had become the assignee of that lease; and he tendered compliance with the conditions of the option. Smith, who thus found his own scheme for a higher rate unexpectedly blocked, refused for a time to make conveyance of the property; but finally having come to an understanding with Snow and Marr, whereby an interest was reserved to him out of the interest for which Marr had stipulated with Snow as the consideration for his (Marr's) manipulation of the business, he executed a deed of conveyance to Snow, in accordance with the terms of the contract contained in the lease, part of the purchase money being paid in cash and part secured by deed of trust. The conveyance by Smith was not directly to Snow, but to one Cole, it is said, for convenience; and Cole conveyed to Snow, who yet remains the record owner, subject to the deed of trust to secure Smith, and subject to any rights which Smith and Marr may have in the profits that may be realized.

It is this transaction by which Snow became the assignee of the leasehold interest owned by the Base Ball Company, and finally the fee simple owner of the property, that the complainants seek to invalidate by their complaint as a fraud upon the company and upon the stockholders who did not consent to it. It becomes necessary, therefore, to inquire to some extent into the organization and management of the company.

As already stated, the original incorporators of the company in 1886 were Robert E. Hewett, Charles E. White, Henry B. Bennett, Michael B. Scanlan, Robert Drinkard, and A. T. Britton; and, as also stated, there was considerable friction, at least for a time, if not permanently, between members of the old organization and those of the new company, some having been members in both, with regard to their respective rights. On April 6, 1886, a resolution was adopted authorizing the issue of additional shares of stock to those who had come from the old company into the new one, on condition that out of the assets of the old organization they should pay the debts of that organization.

It is said that this condition was not complied with, but it is also said that there were no debts of the old organization to be paid. It is a fact, however, that no additional shares of stock were ever issued; and that the number of shares remained at twenty during the whole time of the corporate existence.

The incorporators and the shares of stock taken by each in the organization of February, 1886, were as follows: Robert C. Hewett, 9 shares; W. E. Boughton, 1 share; Michael B. Scanlan, 1 share ; A. T. Britton, 1 share; Richard A. Cronin, 1 share; W. F. Hewett, 1 share; F. D. Dowling, 1 share; C. Heurich, 1 share; Leipold Weiss, 1 share; John Raedy, 1 share; Thomas Walsh, 1 share; and the Columbia Railway Company, 1 share. After the death of Hewett, in or about September, 1888, the stock was held as follows: Nine shares by the administrators of the estate of Robert C. Hewett, three in number, of whom his son, Walter F. Hewett, was one; and one share each by Walter F. Hewett, Luther E. Burket, W. E. Boughton, Michael B. Scanlan, Richard A. Cronin, F. D. Dowling, Christian Heurich, Leipold Weiss, John Raedy, Thomas Walsh, and the Columbia Railway Company.

In this condition of the stock, a meeting of stockholders, purporting to be an annual meeting, was held on November 7, 1888, and adjourned to November 13, 1888, when there were present Walter F. Hewett, Dowling, Raedy, Boughton, and Burket, representing in all fourteen shares of stock, of which nine belonged to the estate of Robert C. Hewett, for which Walter F. Hewett, one of the administrators of the estate, held a proxy from the administrators. The by-laws provided for the annual meeting to be held on the second Wednesday of September, and for a board of seven directors to be elected at such annual meeting. It does not appear that any meeting was held in September, probably on account of Robert C. Hewett's death. And at this adjourned meeting of November 13, 1888, the stockholders present, who were Walter F. Hewett, Dowling, Raedy, Boughton,

and Burket, proceeded to elect officers, after having first assumed to amend the by-laws by reducing the number of directors from seven to five.   Walter F. Hewett was elected president, secretary and treasurer, and Messrs. Boughton, Dowling and Rock were elected directors, with Hewett. Subsequently Dowling sold his stock to F. E. O'Brien, who took his place on the board of directors; and Walter F. Hewett purchased the shares of Weiss, Raedy and Walsh. So that when, on July 17, 1889, the board of directors voted for the assignment to Snow, the stock was held: Robert C. Hewett's estate, nine shares; Walter F. Hewett, three shares; Burket, Boughton, Rock, O'Brien, Scanlan, Cronin, Heurich, and the Columbia Railway Company, one each.   At this time Hewett held Scanlan's stock also under an assignment of it to him in December, 1888, with a proviso for its reassignment in the event that he should not pay for it within twelve months.   It was not paid for within the twelve months, and after the lapse of that period it was reassigned to Scanlan.   No transfer had ever been entered on the books of the company.

The directors who were present at the meeting of July 17, 1889, and who held or represented sixteen shares of stock, voted unanimously for the assignment to Snow.   Scanlan, Cronin, Heurich and the Columbia Railway Company were not on the board; but Heurich and the railway company have acquiesced in the action taken by the board.   At all events, they do not join in these proceedings.   The shares of stock against which Hewett sought to indemnify Snow were three; but which three these were does not clearly appear.

In the year 1889 and 1890 there was a considerable advance in the value of real estate in Washington, and especially, it would seem, in the neighborhood of which the real estate in question is located, in consequence of the determination of Congress to select as a site for a new printing office some suitable property within a specified area, which included this property.   Snow offered it to the Government

at a largely advanced price beyond that which he paid for it. This was on September 25, 1890. In a few days thereafter, on the 1st of October, 1890, more than a year after the assignment of the Base Ball Company to Snow, and five months after the company had gone into practical insolvency, by an assignment of all its property to a trustee for the benefit of its creditors, the complainants Scanlan and Cronin, the latter as the administrator of Richard Cronin, who had died in the meantime, filed this bill in equity, charging that Snow, Hewett, Burket and O'Brien had colluded with each other to defraud the corporation; that the assignment and sale to Snow was a mere pretense; that there was no legal board of directors in existence at the time that could authorize the transfer; that Hewett had no authority to make the sale; that he did not consult the stockholders about it; and that the sum of $12,200 paid to Hewett was a grossly inadequate price for the property. And the prayer of the bill was that the assignment to Snow and the deed to him from Smith should be decreed to be void; that if it should be held that the title vested in Snow, he should be decreed to hold it as a trustee; that the court should administer the fund to be derived from the sale of the property for the payment of the defendant Smith and the use of the stockholders.

The defendants who were mainly interested sharply denied all the substantial allegations of the bill; and Snow filed a cross-bill to quiet his title. Testimony was taken on behalf of the complainants; the defendants contented themselves with the cross-examination of the witnesses, most of whom were in fact the defendants themselves.

In the course of the testimony, or at the end of it, a petition was filed on behalf of Charles E. White, asking to be made a party complainant, which was agreed to and allowed. He claimed to be a stockholder, and adopted the averments of the bill.

The defendants denied the allegations of the petition.

Finally the cause came on for hearing in the special term Supreme Court of the District of Columbia, and that court

dismissed the bill of complaint, as well as White's petition, and decreed in favor of Snow on his cross-bill. And from the decree the complainants appealed to the General Term, whence the cause has been transferred to us.

*Messrs. Cook and Sutherland* and *Mr. W. L. Cole* for the appellants.

*Mr. J. J. Darlington, Messrs. Shellabarger & Wilson* and *Mr. A. A. Hoehling, Jr.*, for the appellees.

Mr. Justice MORRIS delivered the opinion of the Court:

Three questions are presented to us for determination in this case: 1st. Whether the complainants and the petitioner White are entitled to maintain this bill; 2d. Whether there was fraudulent collusion or conspiracy to cheat the corporation, as charged in the bill; 3d. Whether the assignment from the Base Ball Company to the defendant Snow was not void in consequence of want of authority in the parties who claimed to act for the Base Ball Company.

1. It is very clear to us that the petitioner White has no standing in this case. He was, it is true, one of the original incorporators of the company, who executed the certificate of incorporation and had been connected with the previous organization; but it does not appear that he ever actually became a stockholder in the new company. He claimed to be entitled to stock in consequence of his interest in the first company; but this seems to have been refused to him; and when he and others filed a bill in equity to enforce their alleged rights in that regard, and to be recognized as stockholders of the new company, their effort was unsuccessful and their bill was dismissed. In his petition filed in this cause, Mr. White alleged that he was a stockholder of the present company; but in the stipulation entered into with reference to the petition and which served for an answer to it, this allegation was explicitly denied, as well as the other allegations of the petition, and no proof whatever was taken to overcome this denial. On the contrary, the proof ad-

duced on behalf of complainants showed conclusively that he was not a stockholder in fact, whether he was entitled so to be or not.   And the dismissal of his bill, as already stated, would seem to indicate that he was not entitled to any interest whatever in the new organization.   His petition, therefore, in this cause was very properly dismissed.

It is equally clear that the complainant Scanlan has no standing in the case.   On December 28, 1888, several months before the initiation of the proceedings here in controversy, he had sold his stock to Hewett, had assigned his certificate to him, and had ceased to be a stockholder in the company.   More than six months after the proceedings had been consummated he again became a stockholder by the failure of Hewett to pay for the stock and the reassignment of the certificate on May 17, 1890.   The sale of his interest by Scanlan to Hewett was an absolute and unconditional sale, taking immediate effect, although Hewett had twelve months in which to pay for the stock, and had the option to reassign and surrender it at the end of that time, if he then preferred not to pay for it.   Hewett held the stock for over sixteen months, during which Scanlan frequently importuned him for payment of the money.   Hewett, however, finally resolved to return it, and did so on the 17th of May, 1890, as before stated.

It is argued that Scanlan never ceased legally to be a stockholder, because his certificate had never been formally surrendered to the company for cancellation, and had not in fact been cancelled, and no new certificate had been issued to Hewett in place of it.   There was no transfer on the books of the company, and the certificate reassigned by Hewett to Scanlan was the same identical certificate that had been transferred in the first instance by Scanlan to Hewett.   On the back of the certificate was printed the blank power of attorney usual in such cases, which had been filled up and signed by Scanlan, authorizing Hewett to have the proper transfer on the books of the company, but the power had never been executed.   But while for several purposes the

transfer of the stock of an incorporated company is not complete without the surrender of the certificate and the entry of the transfer on the books of the company, and the vendor is still for such purposes to be regarded as the holder and owner of the stock, yet he is only the legal and not the equitable owner; and not being the equitable owner, he can have no standing in a court of equity to enforce equitable rights appurtenant only to the beneficial ownership of the stock. *Hawes* v. *Oakland,* 104 U. S., 450; *Dimpfell* v. *Ohio & Miss. R. R. Co.,* 110 U. S., 209; *Taylor* v. *Holmes,* 127 U. S. 489; Morawetz on Priv. Corp., Secs. 175, 219, and cases cited in notes.

The complainant Cronin, however, stands in a very different position from either Scanlan or White. The deceased, Richard A. Cronin, at the time of the transactions here drawn into question was a stockholder of the company, entitled to all the rights of stockholders. It does not appear that he was consulted with reference to these transactions, and there is testimony that tends to show that he had no notice of the meetings that were held for the purpose of giving effect to the negotiations with Snow. It appears that he was not present at any of those meetings. Hewett states in his testimony that on one occasion he met Cronin on the street and told him of the result of the negotiations, and that he (Cronin) expressed his gratification at this result. But a casual circumstance like this cannot operate as an estoppel to preclude a stockholder from maintaining a bill in equity to enforce his rights as a stockholder. The circumstance itself would seem to indicate that Cronin had no opportunity to express his opinion in the way and at the time at which he was entitled to express it—in the corporate meetings of the company. Cronin being dead, his administratrix is entitled to maintain this bill, unless she is debarred from so doing on the ground of laches or for some other default.

2. We proceed in the next place to the consideration of the main issue made by the bill of complaint, the question of fraud.

If there was fraud or fraudulent combination, or conspiracy to cheat, or collusion or confederation of any kind against the interests of this Base Ball Company as alleged by the complainants, the proof has utterly failed to substantiate the charge. Of course, it is generally difficult to prove fraud; it is in most cases impossible to prove it by direct evidence. Circumstantial evidence from which fraud can be implied is usually all that is in the power of complainants to give. But circumstantial evidence indicative of a condition of things inconsistent with honesty and fair dealing is often as potent as the most direct testimony. Still the rule remains that deeds of conveyance and other solemn acts of parties on which the well-being and good order of society depend, should not be lightly overthrown or disturbed without testimony reasonably sufficient to show that in good conscience they ought not to be permitted to stand.

In the present case we do not find any evidence whatever to sustain the charge. The defendants, or most of them, were examined severally as witnesses, on behalf of the complainants, but their examination failed to develop the fraud or collusion charged in the bill of complaint. With the exception of the defendants Hewett and Snow, there is not even a *scintilla* of evidence that any of the defendants profited in the slightest degree by the transaction in controversy, at the expense of the Base Ball Company, and as to Hewett and Snow, there is nothing to show that the transaction was not entirely legitimate. It is undoubtedly true that Hewett's management of the affairs of the Base Ball Company was loose and irregular; and that he virtually carried on this transaction as though the company belonged to him. But it is not shown that he made any profit by the transaction different from that of the other stockholders. He had or represented a largely greater interest in the company than any other stockholders; and besides that he was by far its largest creditor. It is only natural, therefore, that he should have been solicitous to consummate a bargain that gave him hopes of reimbursement both as a creditor and as a stock-

holder. But this does not imply fraud or fraudulent combination. It may be that there has been no proper accounting by him to his company for the money received by him; but no such accounting is sought in this bill; and such failure to account, if any there was, is not proof of fraud or of fraudulent combination in the transaction from which the money was realized.

The defendant Snow appears to have made a good bargain for himself, and there is undoubted evidence of sharp dealing in the connection of Marr and Smith with the transaction. But that sharp dealing was between themselves; and it does not appear that any of them took undue advantage of the Base Ball Company. So far as we are advised by the testimony in the case, the transaction was engineered by Marr, who had in some way become cognizant of the condition of things, and who, in behalf of Snow and as his agent, made an offer to Hewett as president of the company, to purchase from the company for $12,200 the leasehold interest and option held by the company in the land mentioned in the proceedings. His offer was accepted, and the sale was made. In this there was no fraud.

There is only one circumstance that tends at all to indicate fraud in the transaction, and that is the alleged gross inadequacy of price. Snow purchased for $12,200 the privilege of purchasing the land at the rate of fifty cents a foot. It is said that the land could have been sold at the time for seventy-five cents or one dollar a foot; and that, therefore, the price paid by Snow was grossly inadequate. And it is argued that this assumption is corroborated by the fact that about a year afterwards Snow offered the property to the Government as the site of a printing office for one dollar and a half a foot. But the answer to this argument is very plain. Snow has not sold the property to the Government or to any one. He has asked, but he has not received, one dollar and a half a foot for it. Even if he should receive it, it is a matter of public notoriety that since the conveyance to him there has been a sharp rise in the values of property in that

neighborhood. And it is also a matter of public notoriety that the Government of the United States whenever it needs to purchase real estate is, with or without reason, expected to pay more for it than private individuals would pay. Moreover, although there is some loose talk in the record to the effect that the property was worth much more than Snow paid for it, there is no proof that any genuine offer was ever made larger than that paid by Snow, or indeed any other genuine offer of any kind. And it is a potential fact in this connection that Smith, the owner of the fee simple, had made unsuccessful efforts to procure such offers for the purpose of defeating the option given to the Base Ball Company. Nor is it to be forgotten that what Snow purchased from the company was a somewhat precarious option which it was in the power of Smith to defeat at any time. We do not find in the record any sufficient proof of such inadequacy of price as is charged.

3. There remains the question whether the transaction complained of was not a nullity on the ground that the persons professing to act for the Base Ball Company had no authority so to act. It is argued that there was at the time of the transaction no legally constituted board of directors which could give authority for the conveyance; and that the defendant Snow had knowledge of this invalidity through the knowledge acquired by his attorney, Irving Williamson, who prepared not only the deed of conveyance by the company, but also the resolutions authorizing the conveyance, which purport to have been passed by the board of directors. It is assumed that Williamson investigated the books and papers of the company, and knew, or might have known, that the annual meeting, assigned by the by-laws to be held in September, and at which the board of directors and other officers were to be chosen, had not in fact been held in the September of 1888, but in the November of that year; that at this meeting in November, 1888, the by-laws had been illegally changed so as to provide for a board of five, instead of seven, directors; that there had been voting by proxy at

that meeting and that all the proceedings thereat were irregular, and that the board of directors then elected was an illegal board, without authority to bind the company in any manner.

That the attorney for the grantee in a conveyance from a corporation should prepare the resolution to authorize such conveyance, is not an unusual or unnatural precaution. It implies no knowledge of any previous irregularity in the conduct of the affairs of the organization. It was no part of the business of the attorney to examine into such conduct; and if he did in fact discover such irregularity, it would not follow that his principal would be bound by it, unless information of the alleged irregularity was communicated to him. When in dealing with a corporation we find its affairs in the hands of a *de facto* board of directors, with a *de facto* president and a *de facto* secretary, we are not bound to inquire into the legality of the election of such officers, when there are no others claiming to have a different or a better right; and we are entitled to deal with them, when there are no others, even though we should know that there were grave irregularities attending their election. *Mining Co.* v. *Anglo-Californian Bank*, 104 U. S., 192 ; *Ralls County* v. *Douglass*, 105 U. S., 728.

But the testimony does not show any such invalidity as is claimed. It is very true as already stated, that there was great looseness and even great irregularity in the management of the affairs of this company, although there is nothing to show fraudulent design in this mismanagement; but while there was irregularity, there was no illegality.

It was neither illegal nor irregular for Hewett to represent by proxy the estate of his father, of which he was one of three administrators. In general, voting by proxy cannot be allowed, unless authorized by the charter or by-laws of the corporation. But a well recognized exception to this rule prevails in the case of stock held jointly by executors, administrators, trustees, or other persons acting in a fiduciary capacity, who have the right to designate one of their

number to represent the interest held by them at corporate
meetings, inasmuch as the corporation is entitled to refuse
recognition of more than one person to represent any one
interest. Indeed, the only way in which stock held jointly
can be voted, is by authority from all of them to one of their
number.

Again, the fact that an annual meeting, required by the
by-laws to be held in September, was not then held, and was
omitted to be held through neglect, forgetfulness or other-
wise, does not preclude the holding of such meeting at a
later time. It is the right and duty of stockholders to main-
tain the corporate organization; and if that right is not exer-
cised at the precise time specified for its exercise, the omis-
sion may be afterwards supplied, and the action of the cor-
porators in supplying it is valid. It seems that in this in-
stance a meeting of corporators of the company was held on
November 7, 1888, at which thirteen shares of the corporate
stock were represented; and that this meeting was adjourned
to November 13, 1888, when fourteen shares were repre-
sented; that at this adjourned meeting an amendment of the
by-laws was made, by which it was provided that the board
of directors should thereafter consist of five persons, instead
of seven, as we infer from this action was the number that
had previously constituted it; and that a board of directors
was then elected, composed of five persons, which was the
same board that in the subsequent July (of 1889) authorized
and ratified the transaction with Snow. It is objected that
all this was illegal and in violation of the charter and by-
laws of the company. We do not so regard it.

The by-laws, so far as we have them in the record, pro-
vide, it is true, for the holding of the annual meeting, which
is the meeting at which officers were to be elected, in Sep-
tember. But, as we have already stated, the right to hold
the meeting and to elect officers was not thereby lost; and
the omission was duly repaired in November. These by-
laws make no provision for their own alteration or amend-
ment; and, therefore, they might be altered or amended at

any meeting of the stockholders where there is a quorum, by a majority vote of those present. It is usual to make it more difficult to alter or amend by-laws, and to provide that it should not be done except at some specified time, after special notice, and by a vote of two-thirds or three-fourths concurring in the change. But in the absence of any such provision, the right of the majority to make the change at any corporate meeting is undoubted. Morawetz on Corporations, 487.

The only provision in the by-laws of this Base Ball Company that is assumed to have any bearing on this point is the eleventh by-law, which reads as follows: " The constitution of this association may be altered or amended by a two-thirds vote of the association at any annual meeting." This provision is meaningless and absurd as it stands. The statute law of the District of Columbia and the certificate of incorporation constituted the " constitution " of the company; and these could not be altered or amended even by the unanimous vote of all the stockholders of the company. It is probable that the expression " by-laws," and not " constitution," was intended to be used here; but we are not justified in inserting it. We can interpret the meaning of by-laws, or decree them to be invalid, but we cannot make by-laws for a corporation. But even if we could indulge in the conjecture that the word " by-laws," and not the word " constitution," was intended to be used, there were the necessary two-thirds present at this November meeting, and concurring unanimously in the proposed alteration; and we have seen that, in contemplation of law, it was an annual meeting.

It is a peculiar circumstance in this connection that the certificate of incorporation provides only for five, and not for seven directors; and the irregularity, therefore, in the action of the company was in the adoption of a by-law antagonistic to the certificate. The by-law repealed by the meeting of November 13 was itself apparently a nullity; and that meeting did no more than to conform to the certificate instead of an illegal by-law. It might very properly have disregarded that by-law entirely.

Our conclusion from the whole record of this cause is that the transaction which the bill of complaint seeks to annul has been sanctioned and either authorized or ratified by the holders of nineteen-twentieths of the stock of the company; and that if the proceedings had been entirely regular in every respect, from the beginning to the end, the result would not have been different. The deed in this case was duly and properly executed; it was authorized by the unanimous action of the board of directors; it has been sanctioned, approved and ratified by the holders of nineteen of the twenty shares into which the capital stock was divided. The act itself was one competent to be performed by the company in the ordinary way, by the vote of the majority of the members, or the majority of the board of directors; and there is no ground now for disturbing it. .

We regard the decree of the court below as right and proper ; *and we affirm that decree with costs.*